IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BUCKHORN ENERGY OAKS DISPOSAL SERVICES, LLC and OAKS DISPOSAL SERVICES, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> CLEAN ENERGY HOLDING COMPANY, LLC, BRUCE BENTZ, T.J. HERRMANN, JOHN WALSH, KEN HOSTETTER, SHELDON SMITH, JOHN DOES 1-50, and JOHN DOE ENTITIES 1-5, <br><br> Defendants. | CV 16-141-BLG-TJC <br><br><br> **ORDER** |

Plaintiffs Buckhorn Energy Oaks Disposal Services, LLC ("Buckhorn") and

Oaks Disposal Services, LLC ("Oaks") (collectively, "Plaintiffs") filed this action

against Clean Energy Holding Company, LLC ("Holdings"), Bruce Bentz, T.J.

Herrmann, John Walsh, Sheldon Smith (collectively, the "individual Defendants"),

and Ken Hostetter, alleging various causes of action related to a debt accrued by a

nonparty corporation, Clean Energy Fluid Systems, LLC ("Fluids").  (*See*

*generally* Doc. 1-1.)

Plaintiffs' Complaint and Demand for Jury Trial (the "Complaint") (Doc. 1-

1) asserts claims for piercing the corporate veil (Count I); unjust

enrichment/*quantum meruit* (Count II); breach of a personal guaranty against the individual Defendants and Hostetter (Count III); and breach of the covenant of good faith and fair dealing against the individual Defendants and Hostetter (Count IV).

Pending before the Court is Holdings' and the individual Defendants'[1] Motion to Dismiss for Lack of Personal Jurisdiction or *Forum non Conveniens* (the "motion"). (Doc. 6.) Defendant Hostetter joins the motion with respect to *forum non conveniens* and change of venue only. (Doc. 8.) For the following reasons, the Court orders (1) that the motion to dismiss is denied as to the individual Defendants, and denied with leave to renew following jurisdictional discovery as to Holdings; and (2) the motion to transfer venue is denied.

## I.     Factual Background

For the purposes of the instant motion, the Court accepts as true the uncontroverted facts from Plaintiffs' Complaint. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). In addition, "[i]n ruling on a motion to dismiss for lack of personal jurisdiction, a court may consider declarations, discovery materials, and uncontroverted allegations in the complaint." *Nationwide*

---

[1] Because Holdings and the individual Defendants are jointly represented and brought this motion together, the Court will refer to them collectively as "Defendants." The Court will refer separately to Hostetter except with respect to the motion to change venue, which Hostetter has joined.

*Agribusiness Ins. Co. v. Buhler Barth GmbH*, 2015 WL 6689572, *3 (E.D. Cal. Oct. 30, 2015) (citing *ADO Fin., AG v. McDonnell Douglas Corp.*, 931 F.Supp. 711, 714 (C.D. Cal. 1996)).

Plaintiffs operate a landfill near Glendive, Montana (the "Montana landfill"), which accepts waste with high levels of radioactivity from the exploration and production of oil and gas. (Doc. 1-1 at ¶ 2.[2]) The Montana landfill was established by Oaks, but was acquired by Buckhorn in April 2014. (Docs. 15 at 2, 7-1 at 1.)

In late 2013 or early 2014, Fluids entered into an oral contract with Oaks to dispose of waste at the Montana landfill. (Doc. 1-1 at ¶¶ 3-8.) Fluids agreed to make payment to Oaks every fifteen (15) days. (*Id*. at ¶ 9.) Fluids initially complied with the oral agreement, but later fell in arrears with its payments to Plaintiffs. (*Id*. at ¶¶ 14-16.) Plaintiffs claim that Fluids owes them approximately $610,118.20, plus interest. (*Id*. at ¶ 17.) The instant lawsuit is Plaintiffs' attempt to hold the named Defendants liable for Fluids' debt. (*See generally* Doc. 1-1.)

With respect to personal jurisdiction, the individual Defendants are all residents of North Dakota, and Holdings is a North Dakota limited liability

---

[2] The Complaint's paragraphs are numbered sequentially from 1-22 and then start again from 15. (*See* Doc. 1-1 at page 4.) Any references herein to the Complaint's paragraphs will assume that the paragraph numbers continued in the original sequence.

company ("LLC") with its principal place of business in North Dakota. (Doc. 1 at ¶ 3.) Nevertheless, Plaintiffs allege that the Court has personal jurisdiction over all Defendants on the basis that Fluids was merely the alter ego of Defendants. Plaintiffs further allege that the Court has jurisdiction of the individual Defendants because their forum-related activities subject them to specific personal jurisdiction under Montana's long-arm statute.

Plaintiffs support their allegations with the affidavits of Ross Oakland, the owner of Oaks at the time Fluids began disposing of waste at the Montana landfill, and Gary Ebel, the chief executive officer of Buckhorn after the landfill was acquired from Oaks. (Docs. 15 at ¶¶ 2-3, 17-1 at ¶ 2.)

According to Oakland, Fluids initially fell behind in its payments to Oaks in the amount of approximately $200,000.00. (Doc15 at ¶ 6.) After Oakland contacted various individuals at "Clean Energy" about the debt, Defendants Walsh and Hostetter travelled to Montana and personally met with Oakland at Oakland's farm near the landfill. [3] Oakland discussed with Walsh "the past due payments for Clean Energy, and the fact that [he] had determined to cut it off from any further disposal services until they were current." (*Id.* at ¶ 5.) According to Oakland,

---

[3] Both Oakland and Ebel refer in their affidavits to an entity called "Clean Energy." (*See*, e.g., Docs. 15 at ¶ 5, 17-1 at ¶ 17.) These references result in some confusion due to the fact that Fluids and Holdings are both "Clean Energy" entities. The Court discusses this confusion at greater length below.

"[Walsh] told [him] that he and a partner from Bismarck, I believe his name was Bruce, were interested in investing in Clean Energy and would see that we were paid."  (*Id*. at ¶ 7.)  Oakland maintains Walsh guaranteed Oaks would be paid every two weeks, and the two shook hands on the promise.  (*Id*. at ¶ 8.)

Over the course of the next two weeks, Oaks received two money wires totaling $190,000.00 from the law firm of Smith Bakke Porsberg & Schweigert ("SBPS"), which appears from other exhibits to be Defendant Smith's law firm. (*Id*. at ¶ 9; *see also* Doc. 13-6.)  Oakland maintains that he continued to allow Clean Energy to dispose of waste at the Montana landfill "[b]ased on [Walsh's] personal assurances at my property in Montana and payments I received from [SBPS]."  (*Id*. at ¶ 10.)

After the Montana landfill was acquired by Buckhorn, Ebel discovered that "Clean Energy" had again fallen approximately $500,000.00 behind in its payments for waste deposited in Montana.  (Doc. 17-1 at ¶ 6.)  Ebel explains that "Clean Energy" "dumped hundreds of loads, totaling 33,845.47 tons of oilfield waste," at the landfill from May of 2014 to June of 2015.  (*Id*. at ¶ 5.)  After discovering "Clean Energy's" arrearage to Buckhorn, Ebel spoke to Herrmann, who represented to Ebel "that he and his partners, Walsh, Bentz, and Smith, would make sure Buckhorn was paid."  (*Id*. at ¶ 11.)  Ebel claims that he thereafter had

several phone and email contacts with the individual Defendants who "made repeated representations that Buckhorn would get paid."  (*Id*. at ¶¶ 12, 13.)

When the debt had grown to approximately $1,000,000.00, however, Ebel informed the individual Defendants that he would not accept their waste at the Montana landfill "unless they paid off the balance of their account."  (*Id*. at ¶ 15.) Ebel claims the individual Defendants "suggested restructuring the debt into a note, and agreed that they would personally guarantee the note to Buckhorn."  (*Id*. at ¶ 16.)

Based upon the promises received from the individual Defendants, Buckhorn continued to allow the disposal of waste at the Montana landfill.  Ebel makes clear that Buckhorn would not have allowed "Clean Energy" to continue disposing of waste at the landfill without the individual Defendants' personal guaranty.  (*Id*. at ¶ 19.)  A few months later, however, Ebel learned that the individual Defendants "had not actually signed the Note and Personal Guaranty and were no longer paying off the account as we agreed."  (*Id.* at ¶ 20).

The individual Defendants never informed Ebel that they were not the owners and operators of "Clean Energy," and Ebel believed them to be responsible for "Clean Energy's" operational and financial decisions.  (*Id*. at ¶ 17.)  Ebel did not discover until later that the individual Defendants were involved in multiple companies with the name "Clean Energy," including Holdings and Fluids.  In

Ebel's experience, the individual Defendants ran all of the businesses as "one combined operation which they referred to as Clean Energy." (*Id*. at ¶ 21.)

Defendants dispute Plaintiffs' personal jurisdiction allegations through affidavits executed by Bentz (Doc. 7-4), Herrmann (Doc. 7-3), Walsh (Docs. 7-5 and 21-1), and Smith (Docs. 7-2 and 21-2). According to Bentz,[4] none of the members of Fluids' ownership group own any part of Holdings, and none of the owners of Holdings own any part of Fluids. (Doc. 7-4 at ¶ 8.) The formal relationship between Holdings and Fluids is a joint venture the two entities created in December, 2013. (*Id*. at ¶ 10.)

Bentz states that Fluids opened a waste processing plant in 2012. (*Id*. at ¶ 9.) Earthworks, Inc. ("Earthworks") began managing the plant in December 2013, and it was Fluids, through Earthworks, who incurred the debt to Plaintiffs. (*Id*. at ¶¶ 11, 13.) "The members of Holdings were investors and did not intend to operate or manage the plant in any way, shape, or form." (*Id*. at ¶ 12.) Bentz denies that any of the individual Defendants "have met with or been to the plant of the plaintiff," although Walsh admits in his second affidavit that he did meet with Oakland at Oakland's farm. (*Id*. at ¶ 19; Doc. 21-1 at ¶ 2.

---

[4] The four affidavits attached to the original Motion (Docs. 7-2, 7-3, 7-4, and 7-5) are practically identical; the Court cites to Bentz's affidavit because his name leads alphabetically. Walsh's and Smith's second affidavits (Docs. 21-1 and 21-2) are unique.

Smith maintains in his second affidavit that Earthworks paid the "approximately $195,000.00" debt to Oaks.  (Doc. 21-2 at ¶¶ 4-6.)  Smith denies that any of the individual Defendants "ever agreed to personally guarantee the indebtedness to Buckhorn."  (*Id*. at ¶ 10.)  Rather, Smith claims that the Fluids/Holdings joint venture proposed to pay $80,000.00 per month to Plaintiffs for the indebtedness and any new charges incurred.  (*Id*. at ¶ 28.)

## II.     Legal Standard

The plaintiff bears the burden of demonstrating that jurisdiction is appropriate when a defendant moves to dismiss a complaint for lack of personal jurisdiction.  *Poliseno v. Credit Suisse Securities (USA), LLC*, 2013 WL 1767951, *2 (D. Mont. April 24, 2013) (citing *Schwarzenegger*, 374 F.3d at 800).  Where the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts.  *Id.*  A court's duty is to inquire into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction, accepting the plaintiff's allegations as true.  *Id.*  Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true.  Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.  *Schwarzenegger*, 374 F.3d at 800 (quotations and citations omitted).

Where, as here, no applicable federal statute governs personal jurisdiction, the district court must apply the law of the state in which the district court sits. *Id.* Thus, Montana law will govern whether the Court has personal jurisdiction over defendants. *See Omeluk v. Langsten Slip and Batbyggeri A/S,* 52 F.3d 267, 271 (9th Cir. 1995).

Mont. R. Civ. P. 4(b)(1) governs personal jurisdiction in Montana. Rule 4(b)(1) embodies principles of both general and specific jurisdiction. General jurisdiction may lie if a nonresident defendant maintains "substantial" or "continuous and systematic" contacts with the state so as to be "found within the state," and "subject to the state's jurisdiction even if the cause of action is unrelated to the defendant's activities with the forum." *Bi-Lo Foods, Inc. v. Alpine Bank*, 955 P.2d 154, 157 (Mont. 1998). Specific jurisdiction, on the other hand, will extend to "any person 'as to any claim for relief arising from the doing personally, or through any employee or agent, of any of the . . . acts'" set forth in Rule 4(b)(1). *Milky Whey, Inc. v. Dairy Partners, LLC,* 342 P.3d 13, 17 (Mont. 2015).

The exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice embodied in the due process clause. *Id.* The Ninth Circuit has recognized that Mont. R. Civ. P. 4(b)(1) "permits the exercise of personal jurisdiction over nonresident defendants to the maximum

extent permitted by federal due process. As a result, the jurisdictional analyses under state law and federal due process are the same." *King v. American Family Mut. Ins. Co.*, 632 F.3d 570, 578-579 (9th Cir. 2011) (quotations and citations omitted).

Since Plaintiffs do not argue that either Holdings or the individual Defendants are subject to general personal jurisdiction,[5] the Court will focus its analysis on specific personal jurisdiction. In order to subject a party to specific personal jurisdiction, the court must find that the defendant had "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)). The Ninth Circuit employs a three-part test to determine whether *Burger King*'s requirements are satisfied with respect to a particular defendant:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws[;] (2) [t]he claim must be one which arises out of or results from the defendant's forum-related activities[; and] (3) [e]xercise of jurisdiction must be reasonable.

---

[5] During the hearing held on this motion, counsel for Defendant Hostetter acknowledged that, while Hostetter is a resident of the state of Wyoming, he is subject to general jurisdiction in the state of Montana.

*Omeluk*, 52 F.3d at 270 (citing *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977) and *Roth v. Garcia Marquez,* 942 F.2d 617, 620–21 (9th Cir.1991)). The plaintiff bears the burden of establishing the first two requirements. *Schwazenegger*, 374 F.3d at 802. If a plaintiff does so, the defendant must come forward with a "'compelling case' that the exercise would not be reasonable." *Id.*

To satisfy the first requirement, a plaintiff must establish the defendant "either purposely availed itself of the privilege of conducting activities [in the forum state], or purposely directed its activities toward [the forum state]." *Id.* The purposeful availment analysis is generally used in contract cases, such as the instant case, while the purposeful direction analysis is most often used in tort cases. *Id.*

## III.   Discussion

### A.   Dismissal of Individual Defendants under Rule 12(b)(2)

#### 1.   Purposeful Availment

The Court will first consider whether the individual Defendants purposely availed themselves of the privilege of conducting activities in Montana. "Purposeful availment, which satisfies the first part of the Ninth Circuit test, requires a finding that the defendant has performed some type of affirmative conduct which allows or promotes the transaction of business within the forum

state." *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001) (quotations and

citations omitted).  The Supreme Court explained in *Burger King*:

> [W]e have emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily an intermediate step to serving to tie up business negotiations with future consequences which themselves are the real object of the business transaction.  It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Burger King*, 471 U.S. at 478-479 (quotations and citations omitted).

The Court finds that Plaintiffs have made a prima facie showing that the

individual Defendants purposely availed themselves of the privilege of conducting

activities in Montana.  Plaintiffs pled in their Complaint that the individual

Defendants "agreed with Plaintiffs to pay their bill in timely installments and to

also personally guaranty the amounts owed by [Fluids]."  (Doc. 1-1 at ¶ 33.)  The

affidavits of Oakland and Ebel support this allegation, and further establish that

Buckhorn would have denied any further waste disposal in Montana without the

individual Defendants' assurances and personal guaranty.  (Doc. 17-1 at ¶¶ 16, 19).

In their opening brief, Defendants concede that Plaintiffs "allege certain

'oral contracts' by certain Defendants."  (Doc. 7 at 12, n. 2.)  But they characterize

these allegations as "factually vacuous," and do not address them at any length,

other than to say that oral such contracts "would not necessarily establish sufficient

minimum contacts."  (*Id*.)  After the submission of Oakland's and Ebel's affidavits

with the Plaintiffs' response, the individual Defendants do not address the personal guaranty further in their reply, except for a general denial in Smith's second affidavit that such a guaranty was made. (Doc. 21-1 at ¶ 10.)

Nevertheless, Plaintiffs need only make a prima facie showing of jurisdictional facts, and conflicting statements in the parties' affidavits must be resolved in Plaintiffs' favor. *Schwarzenegger*, 374 F.3d at 800. The Court must, therefore, resolve the conflicting affidavits in Plaintiffs' favor at this stage. The Court therefore assumes to be true that the individual Defendants repeatedly reassured the Plaintiffs that Fluids' debt would be paid, and they ultimately agreed to personally guaranty the debt to Plaintiffs.

Those allegations, accepted as true, are sufficient to find specific personal jurisdiction over the individual Defendants.[6] Accepting those allegations as true, the individual Defendants each assured payment and agreed to personally guaranty a debt for services performed entirely, repeatedly, and over a prolonged period of time in Montana. By doing so, they interjected themselves squarely into a contract (the service contract between Buckhorn and Fluids) that was clearly subject to jurisdiction in Montana. *See Forsythe v. Overmeyer*, 576 F.2d 779, 782-784 (9th

---

[6] Where, as here, a plaintiff raises multiple claims against a defendant and the claims arise out of a common nucleus of facts, the Court need only find jurisdiction with respect to one claim in order to exercise jurisdiction over the defendant as to all other related claims. *Wash. Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 673 (9th Cir. 2012). *See also* 28 U.S.C. § 1367(a).

Cir. 1978) (finding jurisdiction where a defendant "interjected himself into the transaction by assuming personal liability in the event of default on a contract expressly subject to jurisdiction in the California forum").

Further, the individual Defendants negotiated with the Plaintiffs for several months to establish their business relationship at the Montana landfill "going forward," and the individual Defendants' assurance and personal guaranty were provided as an inducement to permit the continued disposal of radioactive waste in the state of Montana.

In short, such prolonged, purposeful conduct is sufficient to ensure the individual Defendants are not "haled into [Montana] solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party of a third person," which *Burger King* explains to be the reason for the "purposeful availment" requirement. *Burger King*, 471 U.S. at 475.

### 2. Relation between Claims and Contacts

Courts apply a "but for" test to determine whether a claim arises out of forum-related activities. *Unocal*, 248 F.3d at 924. This test is satisfied if "the litigation results from alleged injuries that arise out of or relate to the defendant's activities directed at the forum." *Joss v. Bridgestone*, 2009 WL 132040, *11 (D. Mont. May 11, 2009). Here, Fluids' debt to Plaintiffs, and the extent to which the individual Defendants and Hostetter may be liable therefor, serves as the basis of

Plaintiffs' lawsuit. As discussed, that debt was incurred for services provided in Montana, and accrued, at least in part, after the individual Defendants' representations and personal guaranty allowed Fluids to continue to conduct business in Montana. Accordingly, Plaintiffs' claims against the individual Defendants would not have arisen but for their contacts with Montana. This prong is satisfied.

### 3. Reasonableness

Because Plaintiffs have satisfied the first two prongs of the test, personal jurisdiction is presumed reasonable unless the individual Defendants can present a compelling case to the contrary. *Ochoa v. J.B. Martin & Sons Farms., Inc.,* 287 F.3d 1182, 1192 (9th Cir. 2002). Defendants reproduce in their brief the test for reasonableness (Doc. 7 at 8), but that is the extent of their discussion of the issue. Therefore, they have not met their burden to present a compelling case that would overcome the presumption in favor of reasonableness.

### 4. Conclusion

For the foregoing reasons, the Court finds on the basis of the record before it that the individual Defendants are subject to personal jurisdiction in the District of Montana. Defendants' Rule 12(b)(2) Motion to dismiss is denied with respect to defendants Bentz, Herrmann, Walsh, and Smith.

## B. Dismissal of Holdings under Rule 12(b)(2)

Whether Plaintiffs have presented sufficient facts to establish personal jurisdiction over Holdings is a much closer question. First, it is unclear from review of Plaintiffs' Complaint, Response, and affidavits whether they allege that Holdings (as opposed to the individual Defendants) should be subject to personal jurisdiction in Montana without piercing Fluids' corporate veil – that is, whether Holdings conducted sufficient forum-related activities to subject itself to specific jurisdiction under Montana's long-arm statute. Plaintiffs' position on this issue was clarified at the hearing on this motion, during which Plaintiff's counsel advised that their claim against Holdings was based solely upon piercing the corporate veil.

Therefore, the Court must analyze whether Plaintiffs have presented sufficient evidence that Fluids is merely an alter ego of Holdings. Plaintiffs claim "substantial evidence establishes a prima facie showing that Fluids was an alter ego for Defendants," listing numerous factors they believe justify the imposition of alter ego liability on Defendants, which factors the Court will discuss below as appropriate. (*Id*. at 14-15.)

Defendants maintain that Plaintiffs cannot meet their burden to satisfy alter ego liability, at least in part due to heightened requirements commanded by the North Dakota veil-piercing standard. (*Id*. at 6-7.) Defendants further argue

Plaintiffs' concession that this is not a parent-subsidiary case only heightens Plaintiffs' burden. (*Id*. at 10-11.)

### 1. Alter Ego Analysis

First, the Court disagrees with Defendants' argument that Plaintiffs cannot establish alter ego liability because this is not a parent-subsidiary situation. While a parent-subsidiary relationship may be the classic veil-piercing scenario, it is not an absolute requirement for alter ego liability in either Montana or North Dakota. *See Flemmer v. Ming*, 621 P.2d 1038, 1042 (Mont. 1980); *Solid Comfort, Inc. v. Hatchett Hospitality Inc.*, 836 N.W.2d 415, 422-426 (N.D. 2013).

This Court distilled the following requirements for finding alter ego liability: (1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist, and (2) that failure to disregard the corporation would result in fraud or injustice. *Friesen*, 2013 WL 5965917 at *3 (citing *Unocal*, 248 F.3d at 922); *see also Flemmer*, 621 P.2d at 1042; *Solid Comfort*, 836 N.W.2d at 422. Accordingly, the Court will consider whether and to what extent Plaintiffs have made a prima facie showing of these elements.

### a. Unity of Interest

Unity of interest arises when one entity controls another "to such a degree as to render the latter the mere instrumentality of the former." *Unocal*, 248 F.3d at

926. In North Dakota, "[f]actors considered significant in determining whether or not to disregard the corporate entity include: insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings." *Solid Comfort*, 836 N.W. 2d at 422.

There is no precise formula for finding unity of interest in Montana, but relevant considerations include the commingling of funds, the admission to third parties that the corporations are the same, undercapitalization, whether the entities have the same name, and whether the entities have the same directors and officers. *Meridian Minerals Co. v. Nicor Minerals, Inc.*, 742 P.2d 456, 462 (Mont. 1987).

The evidence presented thus far is mixed as to whether Fluids and Holdings share such unity of interest as to render Fluids an instrumentality of Holdings. The primary source of evidence in support of a finding of unity of interest is Ebel's affidavit. (Doc. 17-1.) Detailing his knowledge of Holdings, Fluids, and various other entities, Ebel states in his affidavit that his "experience with [the individual Defendants] and entities was that they always ran the business as one combined operation which they referred to as Clean Energy." (Doc. 17-1 at ¶ 21.)

Defendants do not controvert this claim in their affidavits, and the Court would be obliged to accept it as true at this stage even if they had. *Schwarzenegger*, 374 F.3d at 800.

Accepting this fact as true colors the rest of Ebel's affidavit in a way that supports a finding of unity of interest. Noteworthy facts detailed in Ebel's affidavit include that he was told to contact Walsh, Bentz, and Smith about the payment of Fluids' debt (Doc. 17-1 at ¶ 9); that he spoke to Hermann about the debt (*Id*. at ¶ 10); that the individual Defendants "made repeated representations that Buckhorn would get paid" (*Id*. at ¶ 13); and that the individual Defendants "made all of the operational and financial decisions for Clean Energy, and controlled whether Clean Energy's bills were paid or not" (*Id*. at ¶ 17). The individual Defendants all acknowledge that they are members in Holdings. (Docs. 7-2 at ¶ 2; 7-3 at ¶ 2; 7-4 at ¶ 2; 7-5 at ¶ 2).

If, as Ebel asserts, the Holdings members represented themselves as agents of "Clean Energy," and not as agents of Holdings to the exclusion of Fluids, that would support a finding of unity of interest. This is particularly true since the discussions and negotiations Ebel describes in his affidavit deal primarily with a debt incurred by Fluids.

The record also contains evidence that would militate against a finding of unity of interest. This evidence includes the fact that Fluids and Holdings do not

have interrelated ownership.  (Doc. 7-2 at 8.)  It also includes the existence of the Fluids/Holdings joint venture, which potentially could further insulate Holdings from liability in this case.

### b.    Fraud or Injustice

The second factor the Court must analyze in determining the propriety of alter ego liability is whether "failure to disregard the corporation would result in fraud or injustice."  *Friesen*, 2013 WL 5965917 at *3.  Analysis of the fraud-or-injustice factor is fairly straightforward in this case.  If, as Ebel attested, the individual Defendants did not distinguish between Fluids, Holdings, and the Fluids/Holdings joint venture when dealing with Plaintiffs, and instead referred only to "Clean Energy," then it likely would result in an inequitable outcome to Plaintiffs if the Court were to refuse to exercise jurisdiction over Holdings.  In that case, Defendants could employ the imprecise "Clean Energy" when negotiating with Plaintiffs regarding services at the Montana landfill, later fail to pay for those services, and then claim – as they do in the instant motion – that Plaintiffs were never dealing with *this* "Clean Energy" (i.e., Holdings) but rather only *those* "Clean Energies" (i.e., Fluids and/or the Fluids/Holdings joint venture), even though Plaintiffs were led to believe that there was no meaningful difference between the various entities.

Nevertheless, the Court is not convinced that Plaintiffs have presented sufficient evidence at this time to prove that piercing Fluids' corporate veil is necessary to prevent a fraud or injustice.

## 2. Jurisdictional Discovery

In short, the Court has before it some evidence that suggests it would be proper to exercise jurisdiction over Holdings, some evidence that suggests it would be improper, and many other unanswered questions bearing on the issue. Fortunately, there is a mechanism in place to attempt to gain answers to those questions. Jurisdictional discovery "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inc., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (quotations and citations omitted). The district court has broad discretion to permit jurisdictional discovery, and this Court has done so in the past when personal jurisdiction over a defendant entity would require piercing another entity's corporate veil. *See Churchill v. Trinity Universal Ins. Co.*, 2010 WL 11468358, *7 (D. Mont. March 2, 2010). "Although a refusal to grant discovery to establish jurisdiction is not an abuse of discretion when 'it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction,' discovery should be granted when, as here, the jurisdictional facts are

contested or more facts are needed." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n. 24 (9th Cir. 1977)).

Despite Defendants' characterization of jurisdictional discovery as "a last resort" (Doc. 21 at 14), the Court believes a period of discovery is the most prudent course of action here. There are enough questions outstanding regarding Holdings' relationship with Fluids that jurisdictional discovery is proper before the Court can say definitively whether it can assert jurisdiction over Holdings. Given Ebel's affidavit, and especially his testimony regarding the routine usage among Defendants of the imprecise name "Clean Energy," the Court is unprepared to foreclose the possibility that alter ego liability is necessary to prevent injustice to Plaintiffs. However, Plaintiffs will need to present more evidence supporting their alter ego claim in order to withstand a subsequent motion challenging the Court's personal jurisdiction over Holdings.

### 3. Conclusion

For the foregoing reasons, Defendants' Rule 12(b)(2) motion to dismiss with respect to Holdings is denied without prejudice. After the Defendants have filed their answers and this case is at issue, the Court will issue a scheduling order to include a period of jurisdictional discovery relative to Plaintiffs' claims against

Holdings.  Defendants will be permitted to reassert their jurisdictional argument at the close of the jurisdictional discovery period if they so choose.

### C.      Transfer of Venue under Rule 12(b)(3)

Defendants[7] argue alternatively that, should the Court find personal jurisdiction over them, it should order that the case be transferred to the District of North Dakota.  (Doc. 7 at 15-21.)  Defendants cite various factors courts should consider when faced with a motion to transfer venue pursuant to 28 U.S.C. § 1404(a), and argue broadly that those factors support transfer of venue in this case.  (*Id.*)  Specific arguments in favor of transfer include that Buckhorn is not a Montana entity, that it would be more convenient for the parties and witnesses to try the case in North Dakota, and that a court sitting in North Dakota is better positioned to apply North Dakota law.  (*Id.* at 20-21.)

Plaintiffs respond that they generally are entitled to their choice of forum, and that Defendants have not carried their substantial burden to disturb that choice.  (Doc. 13 at 25-28.)

The Court has the discretion, under 28 U.S.C. § 1404(a), to transfer a civil action to a different venue.  The governing statute provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or

---

[7] As discussed above, defendant Hostetter joins this portion of Defendants' Motion.  (Doc. 8.)  Accordingly, Hostetter is included in the collective "Defendants" with respect to the transfer-of-venue issue only.

division where it might have been brought or to any district or division to which all parties have consented.

28 U.S.C. § 1404(a).[8]  A decision to grant a motion to transfer venue must be based on an "individualized, case-by-case consideration of convenience and fairness."  *Jones v. GNC Fran., Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

The moving party bears the burden of establishing that venue should be changed.  *Jones*, 211 F.3d at 499.  "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).  "When a discretionary venue transfer would only shift the inconvenience from defendant to plaintiff, the motion to transfer should be denied."  *Anderson v. Thompson*, 634 F.Supp. 1201, 1204 (D. Mont. 1986) (citation omitted).

As a threshold to considering a motion under 28 U.S.C. § 1404(a), the Court must first determine whether the action could have been brought in the transferee forum.  "The moving party first must show that the transferee forum is one in

---

[8] Although Defendants refer extensively to "*forum non conveniens*," 28 U.S.C. § 1404(a) "serves as a statutory substitute for *forum non conveniens* in federal court when the alternative forum is within the territory of the United States.  The doctrine of *forum non conveniens* survives in federal court only when the alternative forum is in a foreign country."  *Ravelo Monegro v. Rosa*, 211 F.3d 509, 512-513 (9th Cir. 2000).  Accordingly, the Court will analyze this motion as one for transfer of venue under 28 U.S.C. § 1404(a).

which the action might have been brought." *Gillespie v. Prestige Royal Liquors Corp.*, 183 F.Supp.3d 996, 1001 (N.D. Cal. 2016) (citing *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960)). Here, Defendants assume, but do not establish, that the case could have been brought in the District of North Dakota. The Court does not consider this to be a foregone conclusion, and is not satisfied that venue is proper in North Dakota under any of the bases provided in 28 U.S.C. § 1391(b). The Court finds accordingly that Defendants have not met their threshold burden to establish that the case could have been brought in North Dakota.

For the sake of completeness, however, the Court will assume *arguendo* that North Dakota is a proper venue. The Court must weigh multiple factors to determine whether transfer is appropriate in a particular case. *Jones*, 211 F.3d at 498. Factors frequently considered include:

a.      the plaintiff's choice of forum;

b.      the location where the relevant agreements were negotiated and executed;

c.      the convenience of witnesses;

d.      the ability of the two forums to compel non-party witnesses to testify;

e.      the respective parties' relative contacts with the forums;

f.      the state that is most familiar with the governing law;

g.      the relative congestion in the two forums;

h. the length of time action has already been pending in the transferor forum;

i. ease of access to sources of proof; and

j. whether there is a "local interest" in either of the forums.

*RD Rod, LLC v. Montana Classic Cars, LLC*, 2012 WL 6632185, at *3 (D. Mont. Dec. 19, 2012); *see also Jones*, 211 F.3d at 498–499.  The relevant public policy of the forum state is also a significant factor in this analysis.  *Id.*  Assuming *arguendo* the action could have been brought in North Dakota, the Court will consider each relevant factor in turn.

### a. Plaintiff's Choice of Forum

There exists a strong presumption in favor of a plaintiff's choice of forum. *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1974); *Anderson*, 634 F.Supp. at 1204 (citing *Pacific Car & Foundry Co. v. Pence*, 403 F.2d 949 (9th Cir. 1968)).  "A plaintiff's choice of forum should rarely be disturbed."  *Brunner v. Bawcom*, 2010 WL 3724436, *7 (D. Mont. 2010) (citing *Anderson*, 634 F.Supp. at 1204.) Plaintiffs chose Montana as their forum.  Accordingly, this factor weighs heavily against transferring the action.

### b. Location Where Relevant Agreements were Negotiated and Executed

Defendants argue that this factor favors transfer because any oral contracts in this case will be decided under North Dakota law.  (Doc. 7 at 20.)  Defendants

do not cite any authority in favor of this proposition, and the Court frankly is not convinced that this is so. While Defendants may have been in North Dakota when they negotiated the contracts, there is no evidence to suggest that Plaintiffs have ever been in North Dakota, much less at the time of negotiation or adoption of any operative contracts. Ultimately, Defendants have the burden of making a strong showing that venue should be transferred, and they have not satisfied the Court that North Dakota contract law must apply in this case. The Court therefore finds that this factor neither favors nor disfavors transfer.

### c. Convenience of Witnesses

The "mere fact a party wishes to call witnesses who reside in a transferee district is not sufficient to warrant transfer, unless the party makes a sufficient showing that the witnesses will not attend, or will be severely inconvenienced if litigation proceeds in the transferor forum." *Anderson*, 632 F.Supp. at 1207.

Here, Defendants do not make a sufficient showing to demonstrate that any witnesses will not be available for trial in Montana. Defendants also fail to make a sufficient showing that the witnesses would be severely inconvenienced. Instead, Defendants argue generally that "North Dakota assures more convenience to the vast majority of parties and witnesses" and "transfer is also convenient to the witnesses and evidence." (Doc. 7 at 20-21.) But it is not clear exactly to which individuals Defendants are referring or where those individuals are located. Based

on this lack of detail, it is impossible to determine if witnesses would have to travel significant distances or what those costs may be. Defendants have also not explained why it would be difficult to transfer any evidence to Montana. Accordingly, this factor does not favor transfer.

### d. Ability of the Two Forums to Compel Non-Party Witnesses to Testify

After considering the parties' arguments with respect to burdens on witnesses, the Court concludes that the availability of compulsory process to compel unwilling witnesses is not a significant issue here. Defendants have not identified any specific witnesses who could not be compelled to attend trial. Accordingly, the Court finds that this factor neither favors nor disfavors transfer.

### e. Parties' Relative Contacts with the Forum States

With the possible exception of Holdings, Defendants all have contacts with Montana by virtue of their business at the Montana landfill. Oaks is a Montana corporation. Buckhorn has its principal place of business in Colorado but owns the Montana landfill. It appears transferring the action would merely shift the inconvenience from the Defendants to the Plaintiffs, which is an impermissible basis for transfer. *Anderson*, 634 F.Supp. at 1204. This factor weighs against transferring the action to North Dakota.

### f.      State Most Familiar with Governing Law

Defendants' arguments in favor of the application of North Dakota law are uniformly conclusory and unsupported.  (*See* Docs. 7 at 14, 20; 21 at 6-7, 12.) Even if North Dakota law ultimately should apply, Defendants have not established that is so with the arguments presented thus far.  Accordingly, this factor neither favors nor disfavors transfer.

### g.      Relative Congestion in the Two Forums

The Court may consider the relative congestion of the courts in North Dakota and Montana.  Statistics compiled by the Administrative Office of the United States Courts for the most recent 12-month period available to the Court demonstrate that the comparable weighted filings per judge and the average time from filing to disposition in the Districts of North Dakota and Montana do not favor North Dakota.  *See* Admin. Office of the United States Courts, Federal Court Management Statistics (September 30, 2016).   Accordingly, this factor weighs against transferring the action.

### h.      Length of Time an Action has Been Pending

This action has only been pending for a short time, but the Court concludes that this factor weighs neither in favor nor against the motion to transfer.

### i.     Ease of Access to Sources of Proof

Defendants do not make an argument specific to this factor except to the extent that they argue generally that North Dakota is more convenient to them, to witnesses, and to evidence.  As discussed above, the Court is not persuaded that the location of witnesses and evidence supports transfer.

### j.     Whether There is a Local Interest in Either Forum

Defendants argue that North Dakota has an interest in whether a North Dakota entity's corporate veil can be pierced and in holding North Dakota residents responsible for their debts.  (Doc. 7 at 21.)  Plaintiffs argue that Montana has an interest in this case "because that is where Defendants caused thousands of tons of radioactive oilfield waste to be dumped without payment."  (Doc. 13 at 27.) The Court finds that because both states may have an interest in enforcing the law, this factor weighs neither in favor nor against the motion to transfer.

### k.     Balancing the Factors

Based on the totality of the factors discussed above, the Court finds that they weigh against transferring the action to the District of North Dakota.  Defendants have not presented any unique public policy issues that would render North Dakota the obviously preferable forum.  As a result, the Court concludes that Defendants have not met their burden to disturb Plaintiffs' chosen forum, and Defendants' motion for transfer of venue is denied.

## IV.    Conclusion

Based on the foregoing analysis, the Court ORDERS:

1.    Defendants' motion to dismiss for lack of personal jurisdiction (Doc. 6) is DENIED as to the individual Defendants;

2.    Defendants' motion to dismiss for lack of personal jurisdiction (Doc. 6) is DENIED as to defendant Holdings with leave to reassert their jurisdictional arguments following a period of jurisdictional discovery;

3.    Defendants' and Hostetter's motion for change of venue (Doc. 6) is DENIED.

DATED this 24th day of March, 2017.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge